GRIMMER v. TENEMENT HOUSE DEPARTMENT OF CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. December 3, 1909.)

1. HEALTH (§ 32*) — BUILDING REGULATIONS—TENEMENT HOUSES—APARTMENT HOUSES.

The tenement house act (Laws 1901, p. 889, c. 334), by section 2, subd. 1, defining a tenement house, section 95, stating certain plumbing requirements of such houses, and section 161, repealing all conflicting statutes. and ordinances, repealed New York City Building Code, § 9, defining apartment houses, but not tenement houses, by name, so far as apartment and tenement houses are the same class of buildings; and the Building Code provision was not revived by Revised Charter 1901 (Laws 1901, p. 179, c. 466) § 407.

[Ed. Note.—For other cases, see Health, Dec. Dig. § 32.*]

2. HEALTH (§ 32*)—BUILDING REGULATIONS—"TENEMENT HOUSE"—APARTMENT HOUSES.

Under Tenement House Law (Laws 1901, p. 889, c. 334) § 2, subd. 1, defining tenement houses, and Revised Charter 1901 (Laws 1901, p. 45, c. 466) § 110, creating a tenement house department, and providing for a commissioner, which by section 1340 was charged with enforcing the tenement house law, an apartment house is a "tenement house," no matter how expensively constructed, and is subject to the jurisdiction of the tenement house department.

[Ed. Note.—For other cases, see Health, Dec. Dig. § 32.*

For other definitions, see Words and Phrases, vol. 8, pp. 6913–6915; vol. 8, p. 7814.]

3. HEALTH (§ 32*)—BUILDING REGULATION—TENEMENT HOUSES—APARTMENT HOUSES—HOTELS.

Plaintiff's building held a tenement house, within the definition of Tenement House Law (Laws 1901, p. 889, c. 334) § 2, subd. 1, and Revised Charter 1901 (Laws 1901, pp. 45, 564, c. 466) §§ 110, 1340, creating the tenement house department and charging it with the enforcement of the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

tenement house law, even though on the lower floor the plans had been altered to provide for an office and a public dining room.

[Ed. Note.—For other cases, see Health, Dec. Dig. § 32.*]

4. EVIDENCE (§ 33*)—JUDICIAL NOTICE—REPORT OF LEGISLATIVE COMMISSION.
In determining the legislative intention in enacting the tenement house law (Laws 1901, p. 889, c. 334) the court will take judicial notice of the report of the tenement house commission appointed to draft the law.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 47; Dec. Dig. § 33.*]

Appeal from Judgment on Report of Referee.

Action by Otto Grimmer against the Tenement House Department of the City of New York and others. From a judgment for plaintiff, defendants appeal. Reversed, and new trial granted.

Argued before PATTERSON, P. J., and INGRAHAM, HOUGHTON, McLAUGHLIN, and SCOTT, JJ.

Terence Farley, for appellants.
Martin S. Lynch, for respondent.

SCOTT, J. This is an action in equity for an injunction permanently restraining the defendants from enforcing the penalties prescribed by what is known as the "tenement house act," in cases wherein a building falling within the purview of that act is constructed or maintained contrary to the provisions of the act. The defendants appeal from a judgment, entered upon the report of a referee, granting an injunction as prayed for in the complaint. The building affected is of the class commonly known as an "apartment house" or "apartment hotel," being quite large, expensively built and fitted up, and having on every floor suites of apartments, each of which contains a private hall, a drawing room, library, or dining room, bathroom with a set bath and toilet, three sleeping rooms, a kitchen, and a servant's toilet. There is an elevator, which, with the halls and stairways, is for the common use of all the tenants of the several suites.

The sole question in the case is whether or not this building is, in legal contemplation, a tenement house, within the purview of the tenement house act in force when it was built (chapter 334, p. 889, Laws 1901). If it did fall within the purview of that act, it is concededly an illegal structure, because it does not comply with the requirements of the act, and the plans therefor were not approved as required by law. The question involved is an important one. The plaintiff's building is undoubtedly a high-class apartment house, and a good specimen of a large number of structures which have been erected during recent years in the city of New York; and if it shall ultimately be determined that this building is in contemplation of law a tenement house, and subject to the jurisdiction of the tenement house department, it will follow that all the so-called apartment houses in the city will be subject to the jurisdiction of that department, and must be built and maintained as required by the tenement house act. To determine whether plaintiff's house does fall within this jurisdiction will require

an examination of various statutory provisions. The tenement house act of 1901, supra, defined a tenement house as:

"Any house or building or portion thereof which is rented, leased, let or hired out to be occupied as the home or residence of three families or more, living independently of each other, and doing their cooking upon the premises, or by more than two families upon any floor, so living and cooking, but having common right to the halls, stairways, yards, water-closets or privies or some of them."

This definition had been in force since 1867, except that, prior to the act of 1901, to be a tenement house, a building must have been occupied by "more than three families," instead of by "three families or more." See section 17, c. 908, p. 2273, Laws 1867. Section 666, c. 410, p. 186, Laws 1882, as amended by section 13, c. 84, p. 100, Laws 1887. By the Greater New York charter of 1897 (chapter 378, p. 1, Laws 1897) the definition of a tenement house as contained in the prior acts was repealed (section 1305, p. 463), and stringent provisions were enacted respecting the construction and maintenance of buildings of this class. The enforcement of the law in this regard was intrusted to the department of buildings, without a permit from which department no building of any kind could lawfully be erected in the city of New York. By section 647, p. 224, of the same charter, the municipal assembly was authorized to establish a "building code"; and it was provided that upon the establishment of such a code the several acts in effect at the time of passing the charter, affecting or relating to the construction, altering, or removal of buildings in the city of New York, should cease to have any force and effect and be repealed. The "Building Code" thus authorized was established and took effect on December 23, 1899. It undertook to define a private dwelling (section 8), an apartment house (section 9), a hotel (section 10), and an office building (section 11), but did not define a tenement house, or attempt to legislate regarding such buildings. Thus, prior to 1901, tenement houses were defined in and regulated by the charter, and other buildings were defined in and regulated by the "Building Code"; all classes of buildings being within the jurisdiction of the department of buildings. The tenement house act, containing the definition already quoted, went into effect April 12, 1901; its 161st section providing that:

"All statutes of the state and ordinances of the city so far as inconsistent with the provisions of this act here hereby repealed; provided that nothing in this act contained shall be construed as repealing or abrogating any present law or ordinance in any city of the first class, further restricting or prohibiting the occupation of cellars or increasing the amount of air space to each individual occupying a room, or as prohibiting any future ordinances in respect thereto."

This tenement house act was passed with deliberation, after a report had been made to the Legislature by a commission especially appointed to consider the subject of tenement houses and to prepare and report a law respecting them. It was designed to be a comprehensive act, covering the whole subject, and by its repealing clause, quoted above, it repealed all inconsistent acts and ordinances, including, of course, the Building Code of the city of New York, if, and in so far as, that

Code had undertaken to deal with the subject of tenement houses, as defined in the tenement house act, no matter by what name such buildings should be called. It is quite clear that it was the purpose of the Legislature to segregate tenement houses from other buildings, and to enact an efficient and comprehensive law upon the subject. This purpose of segregation was further evidenced by the revised charter of 1901 (chapter 466, p. 1, Laws 1901), which provided for a new department, to be known as the "tenement house department," and the appointment of a tenement house commissioner (section 110), and charged the new department with the duty of enforcing all the provisions of the tenement house act (section 1340). All other buildings were left within the jurisdiction of the department of buildings. The revised charter was passed on April 22, 1901, and especially, although probably unnecessarily, declared that the Building Code which should be in force in the city of New York on the 1st day of January, 1902, should be binding and in force except as it might from time to time be revised, altered, amended, or repealed (section 407).

From this brief view of the statutory provisions, it is apparent that it was the intention of the Legislature to define what should be deemed a tenement house, to make special provisions respecting such structures, to intrust the enforcement of those provisions to a special department created for that purpose, and to repeal all inconsistent laws and ordinances. If any law or ordinance, as, for instance, the "Building Code," contained provisions respecting such structures inconsistent with the tenement house law, that Code or ordinance was pro tanto repealed, and any subsequent confirmation of such Code would operate only to confirm so much of it as had not been repealed. If it should appear, therefore, that the "Building Code" had undertaken, under another name, to legislate concerning what the Legislature had defined as a tenement house, such attempted legislation would have been repealed by the tenement house act of 1901, and would not have been revived by section 407 of the revised charter of the same year. The "Building Code" did define a class of buildings called "apartment houses," and it is the contention of the defendants that this definition is identical, in all essential particulars, with the definition of a tenement house in the tenement house law. It reads as follows:

"An apartment house shall be taken to mean and include every building which shall be intended or designated for, or used as, the home of three or more families or households, living independently of each other, and in which every such family or household shall have provided for it a kitchen, set bath tub and water-closet separate and apart from any other."

Comparing this definition with that of a tenement house as contained in the tenement house act and heretofore quoted, it will be seen at a glance that both apply to the same kind of building, to wit, one intended and used as the home of three or more families or households, living independently of each other, and doing their cooking within their own premises. In the definition of a tenement house there is expressed, and in the definition of an apartment house necessarily implied, the common right of the occupants to use the public halls and stairways, without which access to the several apartments could not be secured. What is provided for in the definition of an apartment house,

and is not, in terms, provided for in the definition of a tenement house, and what served in the mind of the learned referee to establish a marked difference between the two classes of buildings, is the existence of "a kitchen, set bath tub and water-closet, separate and apart from each other." Evidently the existence of a place for cooking (and a kitchen is nothing else) is contemplated in each apartment in a tenement house, and section 95 of the tenement house act provides that:

"In every tenement house hereafter erected there shall be a separate water-closet in a separate compartment within each apartment, provided that where there are apartments consisting of but one or two rooms, there shall be at least one water-closet for every three rooms."

The substantial difference between the definitions, as they stood when the plans for the plaintiff's building were filed, is thus reduced to one, to wit, the requirement that in an apartment house there shall be a set bath in each apartment, and by section 56, c. 179, p. 418, Laws 1903, section 95 of the tenement house act has now been amended so as to provide for, but not require, set baths in tenement houses. It seems to be quite clear that the definition of a tenement house in the tenement house act and that of an apartment house in the Building Code served to describe the same kind of building, and legally speaking covered the same subject. If so, we are of the opinion that it was the intention of the Legislature to subject all such buildings, whether plain or ornate, cheap or expensive, to the provisions of the tenement house act, and to bring them under the jurisdiction of the tenement house department. It is true that within either of these definitions may be embraced buildings of widely different external appearance and internal adornment, ranging from the low-priced tenement, with apartments renting for a few dollars a month, to the palatial structure whose rentals are expressed in thousands of dollars. Between these extremes are to be found a vast variety of buildings, and if a distinction were to be made between tenement houses and apartment houses it would be almost, if not quite, impossible to fix the dividing line between the better class of tenements and the cheaper class of apartments. The difficulty of so doing was distinctly recognized by the commission which drew the tenement house act, and it is made clear by their report to the Legislature, which accompanied the act which they proposed, that the tenement house act was intended to apply to and cover high-class and expensive apartment houses, as well as the cheaper tenement houses. Of that report we may take judicial notice in seeking to ascertain the intention of the Legislature. Tenement House Department v. Moeschen, 179 N. Y. 325–331, 72 N. E. 231, 70 L. R. A. 704, 103 Am. St. Rep. 910; People ex rel. Cohen v. Butler, 125 App. Div. 384–388, 109 N. Y. Supp. 900.

Upon the subject we are now discussing the commissioners spoke as follows in their report:

### "Definition of Tenement House.

"A tenement house, as defined by law, is 'any house occupied as the home or residence of three families or more, living independently of each other, and doing their cooking upon the premises.' This definition includes those houses

which are popularly called 'tenements,' as well as those which are popularly called 'flats' or 'apartment houses.' Precisely how many of the 2,250,000 people who constitute the tenement house population of New York live in the houses which would be popularly called tenements cannot be stated with absolute accuracy, because the question involves some determination of the dividing line between 'tenements,' 'flats,' and 'apartment houses,' which no one has ever been able as yet to satisfactorily draw. If the line is to drawn between those houses which in their construction and maintenance require regulation for the protection of their inmates and those which will be properly built and maintained for motives of self-interest without regard to legal regulations, it is certain that more than 2,000,000 people—that is, more than half the entire population of New York—are dependent upon the existence and enforcement of a proper tenement house law for their health, protection against fire, and social environment. It has been suggested to the commission that they should distinguish between the tenement and the apartment house, and confine the operation of the tenement house laws to the former. All who have made this suggestion have been asked what regulations for lighting, ventilation, fire protection, and sanitation should be required by law for the protection of the dweller in an East Side tenement which should not equally be required for those who live in West Side apartments, or, even if not required, would not be complied with from motives of enlightened self-interest by every intelligent owner of a first-class apartment house? No such regulation has been pointed out, nor has any member of the commission been able to suggest any. On the other hand, more than 20 officials of the board of health strongly recommend that no change in the law be made, for the reason that there could be no distinction which would not result in evasion of law, and that the only effect of such a distinction would be to give concessions to the larger apartment houses which would be objectionable from sanitary reasons. If, therefore, there is no regulation appropriate to the 'cheapest tenement' which is not equally appropriate to the most expensive 'apartment house,' and which, indeed, would not be complied with in the latter case by far-sighted owners, whether such regulation were or were not required by law, there is no reason to draw a distinction which, since the first enactment of a tenement house law in New York, has been found unnecessary and impracticable, and which, if drawn, would make one set of laws for the rich and another for the poor, a class distinction, obnoxious to the democratic policy of our state."

It seems to us, therefore, that the legislative definition of a tenement house includes and covers the buildings that have come to be known as "apartment houses," and was intended to cover them, so as to bring within the purview of the tenement house act and the jurisdiction of the tenement house department all buildings designed to be occupied and actually occupied "as the home or residence of three families or more, living independently of each other and doing their cooking upon the premises," whether such a building be known as a "tenement house," a "flat," or an "apartment house."

We are not unmindful of the fact that this court and the Court of Appeals have recognized a distinction between tenement houses and apartment houses. White v. Collins Building & Const. Co., 82 App. Div. 1, 81 N. Y. Supp. 434; Kitching v. Brown, 180 N. Y. 414, 73 N. E. 241, 70 L. R. A. 742. In each of these cases the question arose under a covenant against the erection of tenement houses, made in 1873, before modern apartment houses were known, or had come into general use. These decisions proceeded upon the theory that the covenant must be read and construed in the light of the conditions which existed when it was executed, and that, when so read, it applied only to what were known as "tenement houses" in 1873. No such question is presented here. The plaintiff's building, both as to its design and

its use, falls within the definition of a tenement house, and, if it is within the purview of the tenement house act, as we think it is, it is concededly an unlawful structure. Indeed, it does not even conform to the requirements of the Building Code, if that applied, respecting the erection of apartment houses.

The original plans for plaintiff's building were filed with the building department on March 30, 1901. Upon these plans the building was designated as an "apartment house." These plans were rejected, because the building depicted upon them did not comply with the requirements of the Building Code respecting apartment houses. The plans were altered in certain regards, and were refiled on April 10, 1901, two days before the tenement house act took effect, but undoubtedly after it had passed the Legislature. Upon these amended plans the building was designated as an "apartment hotel," a structure not known by that name either to the Building Code or to the tenement house act. These plans were approved, although they conformed neither to the tenement house act relating to tenement houses nor to the provisions of the Building Code relating to apartment houses. The claim is now put forth that the building is neither an apartment house nor a tenement house, but a hotel, and therefore not within the jurisdiction of the tenement house department. Its claim to classification as a hotel rests upon the changes that were made in the plans. The wash tubs were shown as taken out, although the evidence shows that there are now wash tubs in all of the apartments. The word "kitchen" was eliminated throughout the house, and the word "serving room" substituted, although the same evidence shows that cooking stoves are in all the apartments. In one of the suites upon the ground floor the words "dining room" and "bedroom" were omitted, and some partitions were eliminated, throwing these two rooms into one, which was designated as a "public dining room." A change of partitions was made in another room, a counter put in, and the room designated as an "office." It appears that, by some arrangement between the owner of the building and the tenant of this reconstructed suite, meals are served therein to any one, whether a tenant in the building or not, who may apply. It also appears, however, that the building contains 15 or 16 suites or apartments fully equipped for housekeeping, with fixed wash tubs, a fixed sink, a gas range, and a refrigerator; that in all or nearly all of the apartments the occupants habitually have their meals cooked in the apartment and eat them there.

The definition of a tenement house includes "any house or building, or portion thereof," which accords with the definition. Irrespective of the restaurant on the first floor, the evidence makes it plain that the building above the first floor complies with the definition of a tenement house. The mere maintenance of a restaurant on the first floor does not change the character of the remainder of the building, or transform it from a tenement or apartment house into a hotel. If the law permitted such an evasion, the tenement house act would soon become a vain thing. Our conclusion is that plaintiff's building, although doubtless what is commonly known as a high-class apartment house, falls legally within the definition of a tenement house, is with-

in the purview of the tenement house act, and subject to the juris-diction of the tenement house department and commissioner.

It follows that the judgment appealed from must be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.